IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **Civil No. 3:23-CV-745** |
| APPROXIMATELY $40,000.00 IN UNITED | ) | |
| STATES CURRENCY SEIZED FROM | ) | |
| DARRYL LANDIS SIMON ON JULY 19, 2023, | ) | |
| AT THE CHARLOTTE-DOUGLAS | ) | |
| INTERNATIONAL AIRPORT | ) | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

NOW COMES the United States of America, Plaintiff herein, by and through Dena J. King,

United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture,

and respectfully states the following:

### I.      INTRODUCTION

1.      This is a civil action *in rem* against approximately $40,000.00 in United States

Currency seized from Darryl Landis Simon ("Simon") on July 19, 2023, at the Charlotte-Douglas

International Airport (the "Currency").    Simon was previously convicted in 1999 for his

participation in a federal narcotics distribution conspiracy.  Further, in 2022, law enforcement

identified Simon's fingerprints on multiple packages, being shipped from California to North

Carolina, that contained multiple pound quantities of cocaine and methamphetamine.  Then, in

July 2023, through an airport interdiction operation targeting luggage on the tarmac bound from

Charlotte for California, a law enforcement K9 alerted to Simon's luggage and law enforcement

located Simon in the airport terminal.  On the day of the seizure, Simon provided an implausible

story of purchasing a transfer truck for his business but was unable to provide any documentation,

a screenshot of the sale posting for the truck that he planned to purchase, or witnesses to

corroborate this tale. Further, law enforcement identified that, in the year and a half prior to the seizure, Simon had spent in excess of $9,000.00 on at least seventeen (17) flights between the East Coast and California, often purchasing tickets at the last minute and with short turnarounds for the trips. His conduct fits the profile of a drug and drug money courier.

2. Thus, the Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

## II. NATURE OF THE ACTION

3. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. § 983, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

4. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

5. Venue is proper pursuant to 28 U.S.C. § 1395 because the Currency was seized in the Western District of North Carolina.

6. The Currency has been seized and is now within the Western District of North Carolina.

7. Based on the following facts, verified by Department of Homeland Security,

Homeland Security Investigations ("HSI") Task Force Officer ("TFO") Stephen Brown, this action seeks the forfeiture of all right, title, and interest in the Currency.

## III.   FACTS GIVING RISE TO FORFEITURE

### A. Simon's prior federal conviction for narcotics distribution conspiracy

8.     On September 21, 1999, a District Court in the Western District of North Carolina sentenced Simon to 78 months in prison for his role in a federal offense related to distribution of cocaine base.  WDNC CASE 3:98-CR-00010.

### B. Simon's shipment of dangerous narcotics from California to North Carolina.

9.     On March 1, 2022, a Customs and Border Patrol (CBP) Officer was using his K9 partner to conduct a canine sniff of packages at the UPS Hub in Louisville, Kentucky.  The canine alerted to two packages.  CBP detained the packages for further examination.

10.    The packages were bound from a UPS Store in El Seguendo, California.  One package was bound for a Charlotte, North Carolina recipient address affiliated with an individual identified herein as "JW" and identified JW's name on the top left-hand corner of the shipping label.  The other package was bound for Wadesboro, North Carolina—the town where Simon lives—and listed an individual identified herein as "AM" on the top left-hand corner of the shipping label .

11.    On March 10 and 11, 2022, HSI obtained search warrants for each package and conducted searches of the packages.  The package destined for Charlotte contained approximately 3.5 kilograms (7.79 pounds) of a substance that a Department of Homeland Security ("DHS") Laboratory later confirmed was cocaine.  The package destined for Wadesboro contained approximately 5.23 pounds of a substance that the DHS Laboratory later confirmed was cocaine and 3.23 pounds of a substance that the DHS Laboratory later confirmed was methamphetamine.

12. The DHS Laboratory retrieved fingerprints from the packages and from the shipping tape used to seal the packages. The DHS Laboratory found Simon's fingerprints on the tape of both packages and found JW's fingerprints on the tape of the Charlotte-bound package.

13. Additional investigation of travel by Simon and JW on and around the date on which the packages were mailed revealed that, on February 27, 2022, Simon and JW flew from Charlotte to Los Angeles, California. UPS Store receipts reflected that the UPS packages discussed above were dropped off just minutes apart, at 9:04 a.m. and 9:13 a.m., on February 28, 2022, at an El Seguendo, California UPS Store. Store receipts reflect that the sender or senders paid over $700 in cash to send the packages via UPS. Then, on February 28, 2022, at 1:36 p.m., a few hours after the packages containing cocaine and methamphetamine were mailed from the El Seguendo UPS Store—a store only approximately 4.5 miles from Los Angeles International Airport—Simon and JW departed on a flight from Los Angeles International Airport.

14. After the packages were sent, a device using an IP address with a service location in Wadesboro—an address that was the same as the Wadesboro shipment address—used the UPS tracking number to track both packages. Simon's travel reservation for a flight to Baltimore, Maryland, purchased on October 20, 2022, was booked via a device using this same IP address.

**C. Simon's frequent travel from the East Coast to California prior to the July 2023 seizure.**

15. Simon's travel history to and from California in the approximate one and half years prior to the July 19, 2023, seizure of the Currency was consistent with that of a drug or money courier who carries currency to the West Coast to pay for narcotics shipped or otherwise transported to the East Coast.

16. Specifically, airline records reveal that, from January 2022 to July 2023, Simon booked seventeen flights between the East Coast and California. On several occasions, Simon's

trips to California lasted two days or less.

17.     Simon also purchased many of his airline tickets last minute, spending at least $9,196.82 on airline tickets during this time-period, conduct also indicative of a drug courier and/or money mule acting on last minute instructions.

18.     On several occasions, Simon traveled with JW, the individual whose fingerprints were found on the narcotics shipments.

**D.  The July 19, 2023 interdiction and seizure.**

19.     On July 19, 2023, HSI seized the Currency at-issue in this case.  The circumstances of the seizure are as follows.

20.     On July 19, 2023, HSI TFO Smith was conducting interdiction operations at Charlotte-Douglas International Airport.  As part of the operations, TFO Smith and TFO Osuch were screening luggage on the tarmac.  In this instance, the luggage was bound for Los Angeles, California, on American Airlines flight 352.  At the time of screening, since the individuals affiliated with or who had checked the luggage were in the terminal and TFOs Smith and Osuch were on the tarmac, TFOs Smith and Osuch were not observing or screening the individuals affiliated with the luggage.

21.     A line up of four suitcases was arranged on the tarmac so that K9 Lily, a properly trained and certified narcotics detection canine, could perform a free air sniff.  K9 Lily alerted to the third suitcase in the line-up.  The suitcase to which K9 Lily alerted displayed a tag with the name, "Simon/Darryl."  TFO Smith contacted TFO Stephen Brown and advised him of the K9 alert, and law enforcement moved the suitcase to the terminal boarding area for Flight 352.

22.     TFO Brown waited in the boarding area as passengers scanned their boarding passes.  When a passenger scanned a boarding pass for Darryl Simon, TFO Brown asked the

5

passenger, who law enforcement later determined was, in fact, Simon, to speak with TFO Brown in regard to the suitcase that law enforcement had, following K9 Lily's alert, removed from the tarmac.

23. Simon agreed to speak with TFO Brown. Simon advised that he had money in his suitcase. Simon gave TFO Brown consent to search the suitcase and again told TFO Brown that Simon had money in the suitcase.

24. While TFO Brown searched the suitcase, he asked Simon the purpose of his trip to California, to which Simon replied he was traveling to purchase a transfer truck.

25. TFO Brown explained to Simon that the K9 was trained to alert to the odor of various narcotics and that the K9 alerted to Simon's suitcase.

26. TFO Brown asked Simon questions regarding his purported purchase of the truck, including where, specifically, he was purchasing the truck. Simon stated that he was purchasing the truck from a dealership but had not spoken directly to the dealership, nor had he seen the truck. Simon told TFO Brown that he was buying the truck from someone named "Travis" who could get the truck wholesale.

27. When asked by TFO Brown about his occupation, Simon responded that he worked in transportation and owned Elite Transportation.

28. TFO Brown asked Simon how he planned to get the truck back to North Carolina. Simon stated that he had employed a driver, named "Trey Johnson," who would drive the truck from California to North Carolina.

29. TFO Brown located a large amount of US Currency in a brown pair of shorts packed in the suitcase. TFO Brown asked Simon about the origins of the Currency, to which Simon replied that the money came from his business. Simon told TFO Brown there was around $30,000.00 in

the pair of shorts.

30.     When asked when he planned to return from California, Simon stated that he would probably be returning the following day.

31.     TFO Brown asked Simon if he had pictures of the truck, which he did not.  Instead, Simon accessed his phone and displayed a stock photo of a Freightliner truck for TFO Brown.

32.     TFO Brown asked Simon if he could provide a telephone number for "Trey Johnson."  In answer to this question, Simon asked Brown if law enforcement had found any narcotics in Simon's bag.  TFO Brown explained that he worked for a task force that investigated money laundering and shipping of narcotics.  Simon stated, "I don't do that."  TFO Brown also explained that he investigated people smuggling money west to purchase narcotics, to which Simon replied, "I don't do that."  Simon did not provide a telephone number for "Trey Johnson."

33.     When asked about any prior drug-related charges, Simon told TFO Brown that he had been charged with a cocaine offense about twenty years ago but no other charges.  Upon investigation, law enforcement discovered that Simon was previously convicted for Aid and Abet Embezzlement (1989), Criminal Sexual Conduct – 2nd Degree (1989), and the aforementioned Conspiracy to Possess with Intent to Distribute Cocaine Base in the Western District of North Carolina (1999).

34.     TFO Brown pointed out to Simon that all of the Currency was in one-hundred-dollar bill denominations and asked if the Currency came from a bank, to which Simon replied, "yeah."  He told TFO Brown that he obtained the money from his "safe vault" at State Employees' Credit Union ("SECU").  For clarification, TFO Brown asked if the Currency came from a "safe vault" and not an account.  Simon stated that was correct, but that he did have an account with SECU.

35.     TFO Brown asked when Simon removed the Currency from his safe deposit box. Simon said he removed the Currency over a three to four-week period, taking out $10,000.00 at a time.  However, contrary to what Simon told TFO Brown in the airport, SECU records indicate that Simon last accessed his safe deposit box in April 2023, approximately three months prior to his flight to California to allegedly purchase a truck.

36.     TFO Brown then asked if there was anyone who Simon could contact to verify the information regarding Simon's purchase of the truck.  Simon then made a couple of phone calls with no answers.  After the unsuccessful calls, Simon made telephonic contact with a person who he identified as "Rob."  Simon contact "Rob" in a purported attempt to contact a person who Simon identified as "Trey."  Simon told "Rob" that Simon was with Officer Brown from Charlotte-Mecklenburg Police Department and that Simon needed to get in touch with "Trey."  Simon told "Rob" that Simon had tried to call him ("Trey") regarding the money and the Freightliner truck that Simon is buying.  Based on the content of the call, Simon was trying, in a partly veiled manner, to instruct "Rob" on what "Trey" should say when/if he is contacted by law enforcement regarding Simon.

37.     At this point, TFO Brown seized the Currency.

38.     As TFO Brown was completing seizure paperwork in front of Simon, Simon again stated that the Currency came from his transportation business.  Simon told TFO Brown that he cashes $30,000.00 and $40,000.00 checks from his business and then deposits the cash into his safe deposit box so that, "he doesn't have to pay taxes twice."

39.     TFO Brown asked Simon how many trucks his company owned, to which Simon stated that his business had three trucks.  Upon further investigation with the US Department of Transportation, TFO Brown determined that Elite Transportation Services, Inc had one truck

which, according to inspection records, was out-of-service as of July 18, 2023. Additionally, the business was required to carry $750,000.00 in insurance but there was not any insurance on file.

40.     At the end of the interaction with TFO Brown, Simon also indicated that the Currency was derived from concerts. However, Simon did not provide any information regarding this statement.

41.     Simon departed the boarding area without boarding his flight.

### *The second K9 alert and additional investigation of the Currency*

42.     Thereafter, law enforcement transported the Currency to the HSI office at the airport.

43.     Law enforcement then placed the Currency in a "blind lineup" consisting of different boxes. TFO K. Bynoe then presented the lineup to K9 Alvin, the second certified and trained K9 to examine one of Simon's items that day.

44.     K9 Alvin alerted to a box which contained the Currency, thus indicating the presence of narcotics.

45.     Law enforcement transported the Currency to Loomis, where it was counted and deposited into an account established to hold seized funds.

46.     The Currency consisted of 400 one-hundred-dollar bills.

### FIRST CLAIM FOR RELIEF – THE $40,000.00 IN CURRENCY
### (21 U.S.C § 881(a)(6))

47.     The United States incorporates by reference the allegations set forth in the paragraphs above as if fully set forth herein.

48.     The $40,000.00 in Currency is subject to forfeiture pursuant to 21 U.S.C. § 881 (a)(6) because it constitutes money furnished or intended to be furnished by any person in

exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

## CONCLUSION AND PRAYER FOR RELIEF

49.     By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1.     A warrant for the arrest of the Currency be issued;

2.     Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3.     Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4.     The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as required by 28 U.S.C. § 1921.

Respectfully submitted this the 7th day of November, 2023.

DENA J. KING
UNITED STATES ATTORNEY

**s/ Benjamin Bain-Creed**
Florida Bar # 0021436
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Email: benjamin.bain-creed@usdoj.gov

## <u>VERIFICATION</u>

I declare under penalty of perjury that the factual information contained in the foregoing

Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the 7 day of November, 2023.

Task Force Officer Stephen C. Brown
Department of Homeland Security,
Homeland Security Investigations